**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MICHELLE ANN BAILEY,**

   **Plaintiff,**

**v.**          **Case No.: 3:17-cv-01365**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

   **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 14). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the

Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On June 28, 2013, Plaintiff, Michelle Ann Bailey ("Claimant"), completed an application for DIB, alleging a disability onset date of January 1, 2000, due to arthritis in her left knee and Morton's neuroma and arthritis in both feet. (Tr. at 219-221, 258). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 147, 155). Claimant filed a request for an administrative hearing, which was held on February 16, 2016, before the Honorable Robert B. Bowling, Administrative Law Judge ("ALJ"). (Tr. at 58-90).  Claimant amended her alleged onset date to January 1, 2009 at the hearing. (Tr. at 65). By written decision dated March 2, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 42-57). The ALJ's decision became the final decision of the Commissioner on December 20, 2016, when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 11, 14). Consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 55 years old on her alleged onset date and 61 years old on her date last insured. She completed high school and one year of college and communicates in English. (Tr. at 63, 257). In the past, Claimant worked as a courthouse marshal, law office

address verifier, landscape gardener, plumber's helper, and a painter. (Tr. at 87).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

3

of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and

the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2014. (Tr. at 44, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2009, her alleged onset date, through her date last insured. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis; disorders of muscle, ligament, and fascia; fibromyalgia; hepatitis; and obesity." (*Id.,* Finding No. 3). The ALJ also considered Claimant's anxiety and depression, but determined that these impairments were non-severe. (Tr. at 45-46). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 46, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk for only six hours total in an eight hour workday; claimant can sit for only six hours total in an eight hour workday; claimant can occasionally climb ladders, ropes and scaffolds; claimant can only occasionally climb ramps and stairs; claimant can only occasionally stoop, kneel, crouch, and crawl; claimant should avoid concentrated exposure to extreme cold, extreme heat, and should avoid concentrated exposure to hazards such as the use of moving machinery and to unprotected heights.

(Tr. at 46-51, Finding No. 5).

At the fourth step, the ALJ found that Claimant could perform her past relevant work as a law office address verifier. (Tr. at 51-52, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 52, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises numerous challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred in placing great weight on the opinions of the non-examining state agency physicians and no weight on the opinions of the consultative examiner and Claimant's treating physicians. (ECF No. 11 at 13-16). Second, Claimant argues that the ALJ did not fulfill his duty to evaluate whether Claimant's combinations of impairments rendered her disabled. (*Id.* at 16-17). In her third assignment of error, Claimant contends that the ALJ's conclusions regarding her activities of daily living are not supported by the record. (*Id.* at 17-18). Next, in her fourth challenge to the Commissioner's decision, Claimant argues that the ALJ should have found that she was unable to maintain full-time employment given the volume of medical appointments that she had in 2013 and 2014 and the vocational expert's testimony that someone with Claimant's RFC that had to miss two or more days a month for doctor's visits could not maintain full-time employment. (*Id.* at 18). Finally, Claimant's fifth assignment of error is that the Appeals Council ignored Claimant's supplemental evidence, which Claimant argues called the ALJ's decision into question and necessitated remand. (*Id.* at 19-20).

In response to Claimant's challenges, the Commissioner first points out that Claimant worked during and after the period at issue in this case; although Claimant's work as a landscape gardener did not constitute substantial gainful activity, the Commissioner notes that the work was considered to be at the heavy exertional level by

6

the vocational expert and involved planting bushes and flowers, digging holes, using machinery and equipment, and lifting items weighing as much as 50 pounds, such as bags of mulch. (ECF No. 14 at 1). Moreover, the Commissioner contends that substantial evidence supports the ALJ's decision that Claimant was capable of performing her past relevant work at the light exertional level, as well as the ALJ's analysis of the opinion evidence. Further, the Commissioner states that the ALJ considered Claimant's impairments in combination throughout the sequential evaluation, as well as her statements regarding her activities of daily living, social functioning, and concentration; the hypothetical posed to the vocational expert included all limitations supported by the record; and the evidence submitted for the first time to the Appeals Council would not change the outcome of the case. (*Id.* at 16-30).

## V.    Relevant Evidence

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A. Treatment Records

#### 1. Treatment prior to alleged onset of disability

On February 29, 2008, Claimant presented for an initial physical therapy evaluation with John Oxley, D.P.T., at Huntington Physical Therapy, Inc., upon a referral from her primary care provider for treatment of bilateral plantar fasciitis, which began approximately one year earlier. (Tr. at 361). Claimant stated that her symptoms were worse on the left and aggravated by standing all day while working as a court marshal. (*Id.*). She reported taking Naproxen from her primary physician. (*Id.*). On examination, Claimant's overall range of motion was normal; her great toe flexion was normal, but extension was limited to approximately 30 degrees bilaterally. (*Id.*). Claimant also had

decreased rear foot motion and tenderness. (*Id.*). Claimant was taught home stretching and modality exercises and was scheduled to receive physical therapy twice per week for four weeks to improve her range of motion and decrease her pain and tenderness. (*Id.*).

Claimant had five physical therapy sessions in March 2008. (Tr. at 362-70). On March 17, 2008, Claimant stated that she continued to feel better and she did not have tenderness in her feet. (Tr. at 368). However, on March 25, 2008, Claimant was "really hurting" because she stood the prior day "cleaning out the garage." (Tr. at 370). She had tenderness and her gait was affected. (*Id.*). Claimant was scheduled to see a podiatrist. (*Id.*).

On April 7, 2008, Claimant saw podiatrist Kevin D. Brown, D.P.M, at Scott Orthopedic Center, complaining of bilateral foot pain and occasional swelling after being on her feet all day. (Tr. at 424). She stated that the pain changed her gait, and she was beginning to have pain in her knees and legs. (*Id.*). Claimant was assessed with hallux rigidus and plantar fasciitis. (*Id.*). Dr. Brown recommended continuing therapy and wearing orthotics for four more weeks. (Tr. at 425). Claimant was given a splint to alternate wearing on each foot at night. (*Id.*).

On April 28, 2008, Claimant followed up with Dr. Brown. (Tr. at 422). She had been wearing the splint prescribed by Dr. Oxley at night, but had the same complaints. (*Id.*). Claimant elected to go forward with a right big toe implant arthroplasty. (Tr. at 423). Thus, on May 6, 2008, Claimant had implant arthroplasty on her first metatarsophalangeal joint ("MJP") on her right foot. (Tr. at 430-432). Claimant saw Dr. Brown on May 14, 2008 following surgery and was doing "very well." (Tr. at 420).

On May 29, 2008, Claimant was still having some pain and swelling, but admitted that she "may have been overdoing it." (Tr. at 418). Dr. Brown recommended that

Claimant decrease her activity and he referred her for physical therapy. (*Id.*). Claimant was also prescribed Voltaren, a topical gel. (*Id.*).

On July 28, 2008, Claimant reported doing "extremely well" following her right toe surgery. (Tr. at 416). She could return to activities as tolerated and Dr. Brown planned to refer her to an orthopedist for a right knee evaluation. He considered a possible repair Claimant's left big toe in the winter. (*Id.*).

### 2. Treatment after alleged onset of disability

Claimant saw family medicine physician, Friday Simpson, M.D., monthly from January 2009 through August 2013. (Tr. at 458-577). On January 13, 2009, Claimant's weight was 229 pounds and she was having "more hot flashes" and "needed something to sleep." (Tr. at 577). She also had chronic back, leg, and foot pain; fatigue; and frequent headaches. (*Id.*). The following month, on February 10, 2009, Claimant told Dr. Simpson that she was having a hard time at work, complaining that her employer was giving shifts to the young, inexperienced employees and she had less hours. (Tr. at 575). She weighed 236 pounds, stating that she gained weight from "stress eating." (*Id.*). Claimant still had chronic back and leg pain and hot flashes, and she ambulated with mild difficulty. (Tr. at 575-76). She had normal range of motion in her back, good flexion at the waist, and no tenderness to palpation. (*Id.*). Her neurological and extremity examinations were normal. (*Id.*). Dr. Simpson diagnosed Claimant with back and joint pain, insomnia, headaches, fatigue, symptoms of menopause, hyperlipidemia, plantar fasciitis, leg and foot pain, and obesity. (*Id.*). He prescribed Lortab for pain, Mobic for inflammation, Ambien for insomnia, and Premarin for hot flashes. (*Id.*).

From March through July 2009, there were no significant changes in Claimant's complaints, examinations, or treatment plan with Dr. Simpson, except that Claimant lost

weight. In May 2009, Claimant noted that she quit her job at the courthouse and was working odd jobs. (Tr. at 563-74). By July, Claimant weighed 210 pounds; however, she gained three pounds back by the following month. (Tr. at 561, 563-64). Claimant also reported to Dr. Simpson during her August 14, 2009 visit that she was very depressed and cried easily about not having a job. (Tr. at 561). On September 10, 2009, Claimant told Dr. Simpson that she was working again and was happy about it. (Tr. at 559). She still had the same physical complaints, but largely normal results on physical examination. (Tr. at 559-60). Claimant was diagnosed with anxiety; thus, Valium was added to her medication regimen. (Tr. at 560).

At her next visit on October 9, 2009, Claimant told Dr. Simpson that she was still depressed about the way that she lost her job. (Tr. at 557). She was not working steadily, but was "helping out friends on occasion." (*Id.*). Her weight was 216 pounds. Claimant was continued on Lortab, Valium, Ambien, Mobic, and Premarin. (Tr. at 558). There were no changes at Claimant's subsequent monthly visit on November 12, 2009, except that Claimant had gained three pounds. (Tr. at 555-56).

On January 12, 2010, Claimant returned to Dr. Simpson's office. Claimant still had depression from the loss of her job, stating that it humiliated her and made her fell worthless. (Tr. at 551). Her weight was 226 pounds, and she was assessed with depression. (Tr. at 551-52). Dr. Simpson asked Claimant if he could refer her to a psychologist. (Tr. at 552). Otherwise, there were no changes. (Tr. at 551-52). At Claimant's following visit with Dr. Simpson on February 9, 2010, she was "doing better," but had depression and anxiety attacks over the loss of her job that she loved. (Tr. at 549). Her weight was 228 pounds. (*Id.*). She was unable to find a psychologist that would take her as a new patient. (Tr. at 550). Otherwise, there were again no changes to Claimant's assessed conditions or

treatment. (Tr. at 549-50).

There were likewise no significant changes in Claimant's visits with Dr. Simpson in March 2010 through May 2011 other than that Claimant continued to lose weight. (Tr. at 516-48). On June 10, 2010, Claimant stated that she just returned from vacation and had a good time. (Tr. at 541-42). Later that month, on June 24, 2010, Claimant had right flank pain, noting that she had been "laying tile" at a friend's house and overworked herself, bending over and hammering for an extended period of time. (Tr. at 539-40). Dr. Simpson prescribed Flexeril in addition to Claimant's regular medications: Lortab, Ambien, Premarin, Valium, Mobic, Vitamin D, and allergy medications. (Tr. at 540). In August 2010, Claimant mentioned that she was very "hurt" over the lack of relationship with her mother; however, in September 2010, Dr. Simpson noted that Claimant was doing well except that she was tired from working all holiday weekend. (Tr. at 532-35). In November 2010, Claimant was still doing better, but continued to be depressed and have panic attacks over her "work situation." (Tr. at 528-29). Claimant noted in January 2011 that she was feeling well and had nice holidays with her family; she went to Iowa to visit her daughter. (Tr. at 524-25, 640). In April 2011, Claimant stated that she was "so depressed" over losing her job. (Tr. at 518-19). In May 2011, Claimant started Fioricet for migraines. (Tr. at 514-15). She was diagnosed with hyperlipidemia, migraines, fatigue, lumbar back, leg, and joint pain, anxiety, insomnia, depression, and allergies. (Tr. at 515). She was still taking Lortab, Mobic, Ambien, Premarin, Vitamin D, and Valium. (*Id.*). She weighed 197 pounds. (Tr. at 514).

On May 11, 2011, Claimant saw Dr. Brown and was given trigger point injections in the Morton's neuroma sites of both feet. (Tr. at 414). The following month, on June 21, 2011, Claimant saw Dr. Simpson for her monthly appointment. She noted that she had

been trying to do yard work, but chronic back and leg pain kept her "from doing much." (Tr. at 512). Claimant was no longer assessed with migraines and her prescription for Fioricet was not renewed. (Tr. at 513).

On July 11, 2011, Claimant advised Dr. Brown that she did not feel much different after the previous injections. (Tr. at 412). She was again given steroid and lidocaine injections in both feet. (*Id.*). She saw Dr. Simpson the following week. Claimant requested Chantix to help her stop smoking. She reported that she had been doing yard work, but it took her longer and she "hurt more" when finished. (Tr. at 510). At her next two monthly visits with Dr. Simpson, Claimant requested another prednisone pack in August 2011 because it helped her feet, and stated on September 15, 2011 that she was doing well except that she was very tired from doing yard work for a friend and her feet were hurting. (Tr. at 507). Claimant weighed 194 pounds. (Tr. at 507, 509).

On September 21, 2011, Claimant told Dr. Brown that she was still having a lot of foot pain and the injections did not help at all. (Tr. at 410). The plan was for Claimant to have a bilateral Morton's neuroma excision. (*Id.*). Claimant saw Dr. Simpson on October 11, 2011, still complaining of chronic back and leg pain, neuropathy in her feet from long hours of standing on concrete, and fatigue. (Tr. at 504).

On November 1, 2011, Claimant saw Dr. Brown, again stating that she was still having a lot of foot pain and the injections did not help at all. (Tr. at 382). She reported a burning sensation in the balls of her feet and constant swelling that was worse in the evening. (*Id.*). Her physical examination was normal. (*Id.*). Claimant was diagnosed with bilateral Morton's neuroma, which Claimant elected to have excised surgically the same day. (Tr. at 382-84, 433). On November 14, 2011, Claimant saw Dr. Brown for post-surgery follow up. She was full weight bearing, but limping on her right side. (Tr. at 408).

Her wound was healing well and her sutures were removed. (*Id.*). Claimant saw Dr. Simpson the next day, noting that she was in pain, as she was wearing shoes for the first time after surgery. (Tr. at 502). Claimant began gaining back the weight that she had lost, weighing 198 pounds at this visit. (*Id.*). Claimant related to Dr. Simpson at her next monthly visit on December 9, 2011 that she had not recovered as she wanted to after surgery and she was "upset with her foot pain." (Tr. at 500-01). Her diagnosed conditions were night sweats; hyperlipidemia; restless leg syndrome and feet pain from recent surgery; lumbar back, leg, and joint pain; migraine headaches; anxiety; fatigue, insomnia, and depression; and allergies. (Tr. at 501). Claimant was advised to hold off on taking Ambien and try Doxepin or Mirapex at bedtime and was prescribed Esgic in addition to her usual medications of Lortab, Valium, Mobic, Chantix, Premarin, Vitamin D, Claritin, and Retin A cream. (*Id.*).

Later that month, on December 28, 2011, Claimant saw Dr. Brown and was doing "pretty well," but still had some pain in the balls of her feet, which was worse on the right. (Tr. at 406). She limped slightly on the right side, but had no obvious instability. Claimant had a full range of motion, and only minimal swelling. (*Id.*). Claimant was noted to be "doing well" and was instructed to continue working on her range of motion daily. (*Id.*). Claimant's monthly appointments with Dr. Simpson in January through June 2012 did not note significant changes, although Claimant continued to gain weight. (Tr. at 486-99). Claimant stated in February that she had recovered since surgery and indicated in April that she still tried to work despite her pain. (Tr. at 492, 496). By June 29, 2012, Claimant weighed 219 pounds. (Tr. at 486). Her diagnosed conditions included fatigue; hyperlipidemia; leg, lumbar back, and joint pain/arthralgia; anxiety, depression, and insomnia; migraine headaches; restless leg syndrome and feet pain; and allergies. (Tr. at

487). She used Lortab for pain, Valium for anxiety, Esgic, Doxepin for sleep, Aleve for inflammation, Simvastatin and Lovaza for hyperlipidemia, Premarin for hot flashes, Vitamin D, Claritin, and Retin A cream. (*Id.*).

On July 12, 2012, Claimant followed up with Dr. Brown and was continued on Relafen. (Tr. at 404). He planned to schedule a MRI if Claimant showed no improvement. (*Id.*). The following month, on August 22, 2012, Claimant reported to Dr. Brown that she had no improvement and felt worse than before her surgery. (Tr. at 402). Claimant was continued on Relafen and given a steroid injection in her right foot. (*Id.*). Claimant saw Dr. Simpson two days later. She weighed 222 pounds. (Tr. at 482). Claimant's complaints focused on her emotions over losing her job; she noted that she had filed a lawsuit over it. (Tr. at 480-81). Claimant's diagnosed conditions and medications remained the same, except that she was additionally prescribed Neurontin. (Tr. at 481). Claimant's complaints, diagnosed conditions, and treatment remained the same over her next two monthly visits with Dr. Simpson. (Tr. at 476-79). She remained emotional over the lawsuit and was working odd jobs. (*Id.*).

On November 14, 2012, Claimant saw Dr. Brown, stating that she was not any better following surgery and had "mind blowing pain" and swelling in the evening after being on her feet all day. (Tr. at 400). Dr. Brown's diagnoses were plantar fasciitis, hallux rigidus, Morton's neuroma, and capsulitis. (*Id.*). Claimant was continued on Relafen for her plantar fasciitis and elected to proceed with revision surgery that would probably occur in January. (*Id.*). Claimant saw Dr. Simpson on the same date in November and also followed up in December 2012 and January 2013. (Tr. at 472-77). There were no significant changes, but Claimant noted in December that she had settled the lawsuit and felt that she was "ripped off by the city." (*Id.*).

14

On January 31, 2013, Claimant saw Dr. Brown. (Tr. at 374). Her gait was normal and she showed no instability, had full range of motion, no obvious deformities or swelling, normal reflexes, and normal muscle strength. (*Id.*). Dr. Brown diagnosed Claimant with capsulitis and hammer toe in her right second toe. (Tr. at 374-75). Claimant wished to proceed with surgery. (*Id.*). Claimant saw Dr. Simpson on February 6, 2013 and was in a better mood since her lawsuit settled; however, she stated that she continued to have hot flashes, even on estrogen. (Tr. at 470). Claimant weighed 224 pounds. (Tr. at 471). Her assessed conditions and treatment plan remained the same. (*Id.*).

On February 26, 2013, Claimant underwent surgery to correct her second MPJ chronic capsulitis with dislocation and hammertoe on the second toe of her right foot. (Tr. at 372). She reported to Dr. Simpson on March 6, 2013 that she was doing better following surgery. (Tr. at 468). Claimant still complained of having pain "all the time" and still reported emotional problems over how she was treated in losing her job. (*Id.*). She weighed 228 pounds and her assessed conditions and treatment were unchanged. (Tr. at 469). On March 13, 2013, Claimant followed up with Dr. Brown following her right foot surgery. (Tr. at 396). She was doing well, and her sutures were removed. (*Id.*).

Claimant saw Dr. Simpson on April 12, 2013 with no significant changes. (Tr. at 466-67). She also saw Dr. Brown again on May 8, 2013. X-rays showed that her foot was healing. (Tr. at 394). Dr. Brown continued Claimant on Relafen and prescribed a a topical compound cream. (Tr. at 395). Shortly thereafter, on May 14, 2013, Claimant saw Dr. Simpson and was "having a terrible time" because her dog of many years died. (Tr. at 464). Her weight was 230 pounds and no changes were made to her assessed conditions or treatment. (Tr. at 465).

On June 11, 2013, Claimant saw orthopedist, Jack R. Steel, M.D., for bilateral knee

15

pain that Claimant stated began six months to one year earlier and was progressively getting worse. (Tr. at 392). Claimant's x-rays showed moderate medial joint space narrowing and patello-femoral degenerative joint disease in her left knee, but only mild patello-femoral degenerative changes and minimal medial joint space narrowing in her right knee. (Tr. at 393). Dr. Steel diagnosed Claimant with chondromalacia patella and osteoarthritis. (*Id.*). He explained that the increased discomfort came from deconditioning due to the previous limitations of her feet. (*Id.*). Claimant was referred to physical therapy. (*Id.*). On the same date, Claimant presented for her monthly visit with Dr. Simpson. She stated that her joints were "killing" her, noting that she had been helping put in a new kitchen and it was taking too long; Claimant stated that she wanted to apply for disability due to joint pain. (Tr. at 462). Knee pain was added to the list of Claimant's diagnosed conditions, but her diagnoses and treatment otherwise remained the same at this and her next visit. (Tr. at 461, 463).

On August 6, 2013, Claimant advised Dr. Simpson that surgery did not stop her pain and she had trouble walking. (Tr. at 458). Dr. Simpson planned to refer Claimant to Allen Young, M.D., for her disability claim. (Tr. at 459). Claimant's diagnosis and treatment remained the same. (*Id.*). Claimant saw Dr. Simpson again later that month, on August 27, 2013. She still walked with mild difficulty and stated that her foot surgeries did not stop the pain. (Tr. at 456). On examination, Claimant had normal reflexes, no joint deformities or edema, good muscle tone, normal strength; however, she expressed tenderness to palpation and maintained a flat affect. (Tr. at 457).

On September 4, 2013, Claimant saw Dr. Brown, who recommended a revision surgery to place an implant in her first MPJ. (Tr. at 446). Claimant told Dr. Simpson later that month, on September 24, 2013, that her feet hurt so bad that she could not walk most

days and was going to have surgery next week. (Tr. at 454). She ambulated with mild difficulty, had a flat affect, and expressed some complaints of tenderness on palpation of her muscles and joints, but she was well groomed, had good range of motion in her back and flexion at the waist, no spinal tenderness, no clubbing or cyanosis in her extremities, normal reflexes and pulses, no joint deformities or edema, good muscle tone, normal strength, was fully oriented, had normal speech and expressions, and did not have neurological deficits. (Tr. at 455).

Claimant's revision implant arthroplasty on the first MPJ of her right foot was performed on October 1, 2013. (Tr. at 448). At her follow up visit on October 14, 2013, Dr. Brown stated that Claimant was doing well and should clean her foot daily. (Tr. at 445). Claimant saw Dr. Brown again on November 4, 2013. Her x-ray showed a healing implant and she was "doing very well" and could progress to supportive shoes. (Tr. at 442-43). Claimant was limping on the side that she just had surgery, but had no obvious instability or deformities, full range of motion, minimal swelling, was vascularly intact, and her wound was healing uneventfully. (Tr. at 442). However, the following day, Claimant presented to Dr. Simpson as an "emotional wreck and very liable [*sic*] with tears." (Tr. at 452-53). Claimant stated that her pain persisted following surgery and noted that she applied for disability due to her joint pain, foot pain, and fibromyalgia. (*Id.*). She complained of pain in her back, legs, and feet, but no particular joint pain. (Tr. at 452). Her physical examination was largely normal with the same results as her prior visit with Dr. Simpson in September. (Tr. at 453). Dr. Simpson diagnosed joint, feet, leg, and knee pain; fatigue and insomnia; depression and anxiety; hyperlipidemia; lumbar back pain, arthritis, arthralgia, restless leg syndrome, and fibromyalgia; and migraine headaches. (*Id.*). Dr. Simpson continued Claimant on Neurontin and Lortab for pain, Premarin for

hot flashes, and Relafen for inflammation; he recommended Melatonin for sleep. (*Id.*).

On February 3, 2014, Claimant saw Dr. Brown and had a steroid injection in the second MPJ of her right foot. (Tr. at 1068). Later that month, on February 25, 2014, Claimant was referred to gastroenterologist Charles Yoo Huh, M.D., at the referral of Daniel Macias, M.D., as she had been diagnosed with hepatitis. (Tr. at 752). Claimant had fatigue and some sweating and flushing, but no itching or confusion. (*Id.*). She was taking laxatives for chronic constipation. (*Id.*). Claimant gained 40 pounds over the prior year and a half, but attributed it to her foot problems. (*Id.*). She denied issues on her review of systems, and her examination was unremarkable other than her obesity. (Tr. at 753-54). Dr. Huh planned to do a work-up to identify Claimant's type of hepatitis. (Tr. at 754).

On March 3, 2014, Claimant was admitted to St. Mary's Medical Center for jaundice, likely caused by autoimmune hepatitis. (Tr. at 760-61). Her echocardiogram showed normal systolic function, no regional wall motion abnormalities, and an ejection fraction in her left ventricle between 55 and 60 percent. (Tr. at 1031). Later in the month, on March 13, 2014, Claimant followed up with Dr. Huh. Her recent liver biopsy confirmed that she had autoimmune hepatitis. (Tr. at 998). Her jaundice had resolved, but she still had fatigue. (*Id.*). Dr. Huh decided to taper Claimant's prednisone and start her on an immunosuppressant, Imuran. (*Id.*). He planned to monitor Claimant's complete blood count (CBC) and liver function while she took Imuran. (*Id.*).

On March 25, 2014, Claimant was referred to Stultz Sleep and Behavioral Health R.E.S.T. Sleep Lab ("R.E.S.T. Sleep Lab"). (Tr. at 824). Claimant stated that she was "in pain all the damn time." (*Id.*). She was diagnosed with severe major depressive disorder, generalized anxiety disorder, chronic pain syndrome, nicotine dependence, and restless leg syndrome. (Tr. at 827). Her treatment plan included therapy; the antidepressant,

Viibryd; Vitamin D; and Inderal for anxiety and hand tremors. (*Id.*).

On April 1, 2014, Claimant saw endocrinologist Daniel Macias, M.D., but no new issues were noted. (Tr. at 996). Claimant followed up with Dr. Huh on May 6, 2014. She reported gaining weight on the steroids that she was taking for her autoimmune hepatitis. (Tr. at 991). Dr. Huh told Claimant to finish her prednisone that week and continue on Imuran at an increased dose. (*Id.*).

On May 15, 2014, Claimant saw Lola Toney at the R.E.S.T. Sleep Lab. Claimant stated that she was "spent" and tired all of the time. (Tr. at 1060). She only felt comfortable lying down and watched John Wayne movies to distract herself. (*Id.*). The same month, on May 28, 2014, Claimant presented as a new patient to family medicine physician, Russell O. Snyder, M.D, at Ultimate Health Services, Inc. (Tr. at 988). Claimant noted that she was working as a self-employed landscaper. She reported fatigue, which Dr. Snyder believed was related to her autoimmune hepatitis; he recommended vitamin B-12 tablets and ordered blood work. (Tr. at 988, 990). Claimant was given samples of Celebrex for her osteoarthritis. Dr. Snyder ordered x-rays of Claimant's knees, which showed moderate progression of osteoarthritis in both knees, but there was no effusion or fracture. (Tr. at 985, 990).

On June 2, 2014, Claimant saw Dr. Brown. Her feet were doing well, and she had "no concerns." (Tr. at 1065). Claimant was fully oriented; with a normal gait, muscle strength, tone, and reflexes; no obvious instability, deformities, swelling, or redness; full range of motion; asymptomatic flexor and extensor tendons that were within normal limits; and normal peripheral pulses, sensation, and neurological findings. (*Id.*). Her x-rays showed no acute process. (*Id.*). Claimant also saw Dr. Snyder that month. She stated that she was considering a second opinion regarding her diagnosis of autoimmune

hepatitis. (Tr. at 976). She reported feeling like she was "falling apart," thought her skin smelled, and believed her liver was "rotting." (*Id.*). She was taking Viibryd for depression, which was prescribed by Dr. Shultz. (*Id.*). Claimant requested steroid injections for her bilateral osteoarthritis in her knees, stating that Celebrex was not helping. (*Id.*). She also complained of fatigue and diaphoresis and was on Premarin for those symptoms. Claimant requested referral to a gynecologist for hormone replacement therapy. (*Id.*). On examination, Claimant's gait was normal; she had full range of motion in her extremities; and she had no focal deficits. (Tr. at 977). Claimant received steroid injections and was told to continue Celebrex and Viibryd. (Tr. at 977, 979).

On June 25, 2014, Claimant saw Ms. Toney at the R.E.S.T. Sleep Lab. Claimant reported having "good days and bad days." (Tr. at 1059). She had nausea and some vomiting from her autoimmune hepatitis medications. Claimant indicated that she was going to the Cleveland Clinic for a second opinion, because she did not want to "lay in bed and die at 98 pounds." (*Id.*). Claimant noted that she quit smoking on April 7, 2014. (*Id.*). She reported spending a lot of time in bed and felt that it could be partly caused by depression due to lack of control over her physical condition. (*Id.*).

On August 5, 2014, Claimant saw Dr. Huh. She was taking Imuran for autoimmune hepatitis. (Tr. at 967). Her liver enzymes and CBC were normal, and she was feeling much better. She had more energy and felt able to work. (*Id.*). Later that month, on August 20, 2014, Claimant presented to certified family nurse practitioner, Rebecca A. Conaway. Claimant reported experiencing anxiety most of the time and depression almost all of the time. (Tr. at 965). She was noted to be self-reliant in her daily activities, but not fully able to manage the household. (*Id.*). Claimant saw Dr. Snyder a little over a week later on August 28, 2014. Her liver function tests were now within normal limits. (Tr. at 957).

Claimant stated that the steroid injection at her last visit worked well for two days and then the pain returned. (*Id.*). She wanted to try a medication to help her with weight loss; thus she was started on Qsymia. (Tr. at 957-58). X-rays of Claimant's left knee showed progressing moderate osteoarthritic changes, primarily affecting the medial joint compartment, but no effusion. (Tr. at 953). Claimant was fully oriented, had a normal gait and full range of motion in her extremities, with no focal deficits. (Tr. at 958). Claimant was to continue Imuran for her hepatitis. (Tr. at 958).

### 3. Treatment after Date Last Insured

On October 1, 2014, Claimant had no new complaints for Dr. Macias. (Tr. at 950). Shortly thereafter, Claimant saw Dr. Huh for her three-month follow-up visit on October 6, 2014. Her fatigue was improved, but she complained of bloating, which Dr. Huh thought could be lactose intolerance. (Tr. at 946). Claimant also attended a session with Ms. Toney on October 9, 2014. Claimant stated that she was "close to being okay" and felt well enough to do landscaping jobs over the summer. (Tr. at 1058). Her illnesses appeared to be controlled with medication and she appeared to be in less physical discomfort. (*Id.*). The plan was to continue to monitor Claimant's mood. (*Id.*).

On October 16, 23, and 30, 2014, Dr. Snyder gave Claimant Synvisc injections in her left knee for her osteoarthritis. (Tr. at 933, 937, 941). She stated that her previous steroid injections only worked for a short period of time. (Tr. at 941). Claimant was on Qsymia for obesity, but had not lost any weight, although she stated that she was dieting and, while she was not exercising, she worked in a job that was strenuous. (*Id.*). Claimant was also on Imuran for autoimmune hepatitis, which seemed to be working for her. (*Id.*). Her dosage of Qsymia was increased and she was continued on Celebrex for left knee osteoarthritis and Imuran for autoimmune hepatitis. (Tr. at 942).

On November 14, 2014, Claimant saw Dr. Snyder, stating that her pain was slightly improved with Synvisc injections and she was not ready for an orthopedic consultation. (Tr. at 929). She gained seven pounds in a month after starting Qsymia; thus, it seemed to not be working. (*Id.*). Claimant was continued on Celebrex and advised to monitor her diet and exercise. (Tr. at 930).

On November 20, 2014, Claimant saw Ms. Conaway. She was doing really well on Premarin, feeling more energetic, and had less hot flashes. (Tr. at 922). Claimant reported that she was surprised how much better she felt. (*Id.*). Claimant was frustrated with her weight, although she was not exercising, eating a lot of frozen yogurt, and attributed it partially to Qsymia. (*Id.*). Claimant denied anxiety, depression, and sleep disturbances. (Tr. at 924). Her physical examination was normal. (Tr. at 925).

On January 9, 2015, Claimant saw Dr. Huh complaining of abdominal swelling. (Tr. at 918). Claimant's hepatitis was controlled on Imuran. (*Id.*). She had gained weight and now weighed 274 pounds. (Tr. at 918, 920). Her ultrasound ruled out ascites; thus, Dr. Huh suspected Claimant had gained extra adipose tissue around her abdomen. (Tr. at 916-18).

On February 5, 2015, Claimant presented to Dr. Snyder with edema in her legs. (Tr. at 914). She stated that she ate a high sodium diet lately and significantly gained weight. (*Id.*). Claimant was prescribed Lasix and Aldactone. (Tr. at 915). Within four days, Claimant's edema completely resolved, she had lost 10 pounds, and she was feeling much better overall. (Tr. at 909). The edema was thought to be secondary to her high sodium diet. (*Id.*). Later in the month, on February 19, 2015, Claimant saw Dr. Snyder, as the edema in her legs returned the day prior. Dr. Snyder ordered tests and prescribed Lasix. (Tr. at 905-06).

On April 8, 2015, Claimant saw Dr. Macias. Her autoimmune hepatitis was "under excellent control." (Tr. at 898). Claimant was still unsuccessful at losing weight and was considering bariatric surgery. (*Id.*). Claimant followed up with Dr. Macias again on June 17, 2015. She continued to struggle with weight. (Tr. at 883). She was taking Synthroid daily, but did not think that it gave her any energy. (*Id.*). Dr. Macias planned to obtain some blood work to assess her fatigue. (Tr. at 883-84). Claimant saw Dr. Snyder the same day. She reported that the cortisone injections were more helpful than Synvisc; she was given steroid injections and her Pennsaid was renewed. (Tr. at 890-91). Claimant had anxiety and depression related to her obesity. (Tr. at 889). Dr. Snyder discussed her diet with her, referred her for bariatric surgery, and continued her on Cymbalta. (Tr. at 890). As Claimant also continued to have hot flashes; she remained on Estrace and progesterone. She was also prescribed a clonidine patch. (*Id.*).

Claimant saw Ms. Conaway also on the same date. Both Dr. Snyder and Ms. Conaway noted that Claimant had good exercise habits, normal activities of daily living, and owned a landscaping business. (Tr. at 887, 894). However, Claimant reported to Ms. Conaway that she was very depressed, staying in bed most days, due to her poor body image and self-esteem. (Tr. at 893). She was in constant knee pain that affected her mobility, but refused to "even consider surgery" at that point. (*Id.*). Claimant stated that she was not watching her diet or exercising due to her depression and pain. (*Id.*). Claimant also reported that she stopped taking Viibryd because "it wasn't helping." (*Id.*). Ms. Conaway thought Claimant's hot flashes were related to her autoimmune disease, noting that Claimant was not eating healthy, exercising, or taking steps to improve her nutrition, which was vital to her recovery and longevity of the disease. (Tr. at 896-97). Claimant refused a nutrition evaluation. (Tr. at 897). Ms. Conaway set the goal that by the next

appointment, Claimant would be walking her dog daily. (*Id.*).

On June 19, 2015, Dr. Snyder recommended Claimant for weight loss surgery, noting that her current weight was 280 pounds with a body mass index of 43. (Tr. at 881). Dr. Snyder stated that Claimant had unsuccessfully tried dieting and was unable to exercise due to severe osteoarthritis in her knees. She also had the comorbidity of hyperlipidemia. (*Id.*). On July 6, 2015, Claimant followed up with Dr. Huh. She was taking Imuran for her autoimmune hepatitis. (Tr. at 876). She was doing well and said that she felt better. (*Id.*). Her activity level was back to normal and she was "not sad anymore." (*Id.*). Claimant's social history reflected that she had good exercise habits, normal activities of daily living, and owned her own landscaping business. (Tr. at 878). Her blood work the prior month was normal, but her ultrasound showed a fatty liver for which Dr. Huh added Vitamin E to her regimen. (Tr. at 876, 880). Claimant was being followed for her obesity; she weighed 271 pounds, having gained approximately 100 pounds over the prior year due to inactivity and steroids. (Tr. at 876, 878). Claimant's physical examination was normal and her dosage of Imuran was reduced in half. (Tr. at 876).

On July 14, 2015, Claimant presented as a new patient to Stanley S. Tao, M.D., at Scott Orthopedic Center. (Tr. at 120). Claimant reported bilateral knee pain with swelling and occasional weakness. (*Id.*). She recently had a series of three Euflexxa injections, which helped. (Tr. at 120-21). Claimant's gait was normal, but x-rays showed moderate to severe medial joint space narrowing. (*Id.*). The diagnosis was localized osteoarthritis, chondromalacia of the patella, and lower leg joint pain. (Tr. at 121). Given that Claimant's osteoarthritis was improved following injections, Dr. Tao planned to watch the condition. (Tr. at 121). Dr. Tao planned to start Claimant on physical therapy and he renewed her prescription for Celebrex and advised her to lose weight. (*Id.*).

On September 24, 2015, Claimant saw Dr. Snyder. (Tr. at 871). Claimant was continued on Celebrex for the osteoarthritis in her knees and also received steroid injections at her request. (Tr. at 872, 874). She had a history of borderline hyperlipidemia, but was not currently on any cholesterol medications and was advised to follow a low cholesterol diet and exercise. (Tr. at 871-72). She was also being evaluated for bariatric surgery with this visit being the first of six required examinations before Dr. Snyder could provide a letter of recommendations for insurance to cover Claimant's surgery. (Tr. at 871). Claimant had lost two pounds in the prior two months and was walking for exercise. (*Id.*). She no longer smoked. (*Id.*). Claimant was advised to control her caloric intake, increase her consumption of water, and exercise daily. (Tr. at 872). Claimant further reported right shoulder pain over the prior four days that she described as "achy with pressure." (*Id.*). She denied any known injury, but had been doing yard work recently. (*Id.*). Dr. Snyder diagnosed a strain/sprain and advised Claimant to take over-the-counter pain medication as needed. (*Id.*).

On October 7, 2015, Claimant saw Ms. Conaway. (Tr. at 863). Claimant weighed 264 pounds and was planning on weight loss surgery, stating that all she ate was "ice cream, frozen yogurt, and sometimes a salad" because it had become a habit from when it was all that she could eat several years ago. (Tr. at 863, 865). Claimant's physical examination was normal. (Tr. at 865-66). She requested a urology consultation for pressure and difficulty urinating. (Tr. at 863, 866). Claimant was not interested in dietary advice; thus, Ms. Conaway felt that she was not a good candidate for bariatric surgery given her lack of interest or effort in improving her diet. (Tr. at 866). Claimant was taking AzaTHIOprine, Celebrex, Clonidine, Cymbalta, Estrogen, Levothyroxine, Pennsaid topical solution, and Prometrium. (Tr. at 863).

25

On March 9, 2016, Claimant saw Dr. Tao. She had been receiving cortisone injections from her primary care physician, Dr. Snyder, every three months; however, Claimant stated that her last injection approximately one month ago did not help. (Tr. at 117). Dr. Tao ordered a MRI of Claimant's left knee, (Tr. at 118), which was taken on March 15, 2016 and showed osteoarthritis and a medial meniscus tear. (Tr. at 91, 100). On March 29, 2016, Dr. Tao planned to repair the tear arthroscopically and attempt to address Claimant's osteoarthritis. (Tr. at 115).

On April 28, 2016, Claimant had arthroscopic left knee surgery to partially remove the torn medial meniscus and to trim and smooth the roughened areas of her patella and trochlea area. (Tr. at 91-92). Claimant had obvious arthritis on the x-ray and her MRI showed a potential medial meniscus tear with arthritis; Claimant was advised that the surgery may not improve her arthritis. (Tr. at 91).

On May 10, 2016, Claimant had a 12-day post-operative appointment with Dr. Tao. Her left knee was stable overall, so her sutures were removed. (Tr. at 111). Claimant was to start physical therapy. (*Id.*). On June 8, 2016, Claimant followed up with Dr. Tao for her six week post-operative appointment. (Tr. at 109). She was participating in physical therapy at HIMG. (*Id.*). Claimant's wound was healing nicely; she had slight medial joint pain to palpation, but the examination of her left knee was otherwise unremarkable. (*Id.*). In her right knee, Claimant had tenderness along the medial joint line and mild swelling; she stated that it was painful to go up or down steps, put pressure on her knee, or kneel or squat. (*Id.*). Dr. Tao requested insurance authorization for a MRI of Claimant's right knee and switched Claimant from Celebrex to Zorvolex for her left knee osteoarthritis. (Tr. at 110). An MRI taken on June 14, 2016 showed advanced arthritis within the medial compartment of Claimant's right knee and lesser degenerative changes in the lateral and

26

femoropatellar joint. (Tr. at 99).

On June 20, 2016, Claimant reported during her physical therapy session at HIMG that her left knee did not hurt as bad as when she began physical therapy and she felt "a lot better." (Tr. at 93). She had an improved ability to ambulate up stairs and more control with her left knee. (*Id.*). The therapist stated that she was "progressing well." (*Id.*). Claimant still needed help with prolonged walking and standing. (*Id.*). Claimant was not limping and had some weakness, but it did not affect her activities. (Tr. at 94).

On June 29, 2016, Claimant presented to Dr. Brown, stating that she needed to discuss obtaining a letter to support her disability claim. (Tr. at 107). Claimant's physical examination was unremarkable, including that she was fully oriented; had a normal gait, full range of motion and muscle strength, normal sensation; and did not have swelling, redness, or any obvious instability or deformities. (*Id.*). Dr. Brown diagnosed Claimant with hallux rigidus. (*Id.*). She was to wear supportive footwear, and she received a steroid injection in her right foot. (*Id.*). Claimant was to follow up in three months. (*Id.*).

On July 11, 2016, Claimant presented to Dr. Tao to review her right knee MRI results. (Tr. at 105). Claimant had mild swelling and stated that it was painful to go up and down stairs or put pressure on her knee; however, Claimant denied any "locking and catching" or "giving way sensation" and stated that her right knee pain was somewhat improved since her last office visit. She requested a refill of Zorvolex. (*Id.*). Claimant was fully oriented with a normal affect; she had a trace limp, but her sensation was intact and she had normal coordination. (*Id.*). Her physical examination was unremarkable other than slight medial joint pain to palpation in her left knee; both knees were essentially painless. Her left knee surgical wound was healed, and her ligaments were stable in both knees. (*Id.*). Her joint pain was improved and she had no radicular pain, joint swelling,

27

stiffness, redness, loss of motion, or reduced strength. (Tr. at 106). Claimant stated that her right knee pain averaged a 2 out of 10. (*Id.*). Dr. Tao diagnosed osteoarthritis and a medial meniscus tear in Claimant's right knee. Given the fact that Claimant was feeling better, Dr. Tao's plan was to continue to monitor her and treat her with Zorvolex. (*Id.*).

### B. Evaluations and Opinions

On October 8, 2013, A. Rafael Gomez, M.D., evaluated Claimant's physical RFC based upon a review of her records. He found Claimant to be fully credible regarding her symptoms, stating that the objective medical evidence alone did not support the claims, but when combined with her restricted activities of daily living, the claims appeared credible. (Tr. at 127). Dr. Gomez opined that Claimant's multiple arthralgias, bilateral Morton's neuroma, and plantar fasciitis reduced her RFC to the light level of exertion with only occasional postural activities and   no concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 128-29). This RFC assessment was affirmed by Rogelio Lim, M.D., on April 22, 2014. (Tr. at 142-45).

On March 17, 2014, Claimant had a mental status examination performed by psychologist, Lisa C. Tate, M.A. (Tr. at 816). Claimant's mental status examination was normal other than her depressed mood, mildly restricted affect, and mildly deficient concentration on the Digit Span test. (*Id.*). Her thought processes and content, judgment, insight, memory, social functioning, persistence, and pace were within normal limits. (Tr. at 818-19). Ms. Tate's diagnostic impression was that Claimant had "Major Depressive Disorder, Single Episode, Moderate, Chronic" based on her reported symptoms of loss of interest and energy, social withdrawal, crying, sleeping difficulty, irritability, and feelings of hopelessness and helplessness over the past five years. (Tr. at 819). Claimant stated that in a typical day, she stayed in bed, watched television, read, and showered. (*Id.*). She

did laundry twice per week, went to the grocery store weekly, and attended medical appointments monthly. (*Id.*).

On April 16, 2014, Paula J. Bickham, Ph.D., performed a psychiatric review technique based upon her review of Claimant's records. Dr. Bickham found that Claimant's mental impairments imposed only mild functional limitations. (Tr. at 140). Dr. Bickham found that Claimant appeared mostly credible, but her cognitive ability and social functioning appeared non-severe at her recent clinical evaluation. (Tr. at 142).

On September 24, 2015, Claimant's physician, Dr. Snyder, completed a RFC form. Dr. Snyder opined that Claimant could stand for only one hour and sit for only two to three hours due to her osteoarthritis. (Tr. at 1045-46). Further, Dr. Snyder felt that Claimant needed to lie down for two hours per day due to joint pain and could only walk for 100 to 200 yards without stopping. (Tr. at 1046). Claimant could consistently reach up above her shoulders and frequently reach down all of the way to the floor, carefully handle objections, and handle with her fingers. (*Id.*). Claimant could lift and carry five to ten pounds regularly. (*Id.*). However, Claimant could not pull, push, or lift and had difficulty bending, squatting, and kneeling. (Tr. at 1047). Dr. Snyder found Claimant's pain complaints to be very credible based upon her x-rays showing osteoarthritis in her knees. (Tr. at 1047-48). He opined that Claimant could not work due to her knee impairment. (Tr. at 1048).

The following day, Claimant's physician, Dr. Simpson, completed a RFC form. Dr. Simpson stated that Claimant could not stand for six to eight hours, but was not sure whether she could sit for that amount of time. (Tr. at 1052). Dr. Simpson noted that Claimant could stand and walk through her house, but could no longer go shopping or work in her yard. (*Id.*). Dr. Simpson based these restrictions on Claimant's feet, hip, and

leg pain; severe fatigue; restless leg syndrome; and fibromyalgia. (Tr. at 1053). He estimated that Claimant could walk about 100 feet without stopping. (*Id.*). Dr. Simpson noted that Claimant had difficulty bending, squatting, kneeling, and turning parts of her body. (Tr. at 1054). He also felt that Claimant's anxiety and depression affected her ability to work and function in daily life. (*Id.*). Dr. Simpson believed that Claimant was credible, noting that he saw her "for years before she became this disabled." (Tr. at 1055). He did not believe that she could work, as she could only stand for a short period of time; her legs were swollen and stiff; and she had autoimmune disease. (*Id.*).

On November 21, 2015, Claimant had an independent medical examination by Allen Young, M.D., at St. Mary's Occupational Health Center, LLC, at the request of Dr. Simpson and her attorney in connection with her claim for social security benefits. (Tr. at 1038). Claimant felt that everything "went downhill" once her foot issues began. (*Id.*). She reported pain fairly quickly when standing, but believed she could stand for one hour before having pain that was so significant that she had to sit. (Tr. at 1039). She further estimated that she could walk for one-half of a block before she had to stop due to pain. (*Id.*). Claimant weighed 264 pounds with a body mass index of 40; she had +1 pretibial edema bilaterally without any obvious varicosities; and her gait was mildly antalgic with a bilateral limp. (Tr. at 1040). Claimant had limited range of motion in the MTP joints of her big toes with pain on passive flexion and extension of the #1 and #2 toes, as well as tenderness and pain in the plantar fascia with passive dorsiflexion. (Tr. at 1040-41). Her grip strength was mildly reduced; she had tenderness in the metacarpophalangeal joints; her Phalens test was positive bilaterally; and her Tinels test was positive over the median nerve in her left wrist, indicating carpal tunnel syndrome. (Tr. at 1041). Claimant had pain and crepitus with movement of both knees, and flexion was limited to 100 degrees on the

right and 110 on the left (normal is 120 to 130 degrees). (*Id.*). The McMurray test caused moderate pain both medially and laterally. (*Id.*). Claimant's mood was mildly depressed with a somewhat flat affect (*Id.*). Her neurological examination was otherwise normal. (*Id.*). Noting the pain in Claimant's feet, knees, and lower back, carpal tunnel symptoms, hypothyroidism, autoimmune hepatitis, and the burden of treatment for such issues, Dr. Young opined that Claimant suffered from the "perfect storm of medical conditions over the prior few years that progressively caused severe limitation in her ability to function as a normal 62-year old." (*Id.*). He did not see any real possibility that Claimant could maintain employment and believed her condition would not improve and would instead likely worsen with time and age. (*Id.*).

On September 26, 2016, following an unfavorable decision by the ALJ, Dr. Young provided a supplemental letter at Claimant's attorney's request, which was submitted to the Appeals Council. Dr. Young stated that he believed Claimant's conditions were affecting her in the same way even two years prior to his evaluation and his opinion would likely have been the same had he seen her in 2013 or 2014. (Tr. at 1087). Dr. Young noted that Claimant's bilateral foot pain dated as far back as 2008, and she had years of bilateral knee pain. (Tr. at 1086). Then, what "put her over the edge functionally" was her autoimmune hepatitis and hypothyroidism that were diagnosed in February 2014, but caused issues for months before the diagnoses. (*Id.*).

On October 3, 2016, Dr. Brown provided a letter that was also submitted to the Appeals Council, stating that Claimant had an 8-year history of foot pain and swelling to the first and second MPJ and ball of the foot. (Tr. at 1085). She also had autoimmune disease affecting her small joints and hepatitis as a secondary diagnosis. (*Id.*). She had a limited ability to stand and walk, and her balance was becoming an issue due to

degeneration of the small joints of her feet. (*Id.*). Claimant had neuropathic pain, which affected her strength and balance. (*Id.*). Dr. Brown opined that Claimant had permanent restrictions in standing and walking, uneven surface walking, ladder climbing, stooping, kneeling, lifting, pushing, or pulling. (*Id.*). Dr. Brown recommended permanent disability for Claimant's autoimmune diagnosis and small joint disease in her feet. (*Id.*).

Claimant's husband, Millard K. Bailey, provided a letter to the Appeals Council dated October 18, 2016. Mr. Bailey stated that Claimant was confined to bed for months following her surgeries in 2009, 2011, and 2013. (Tr. at 347). Mr. Bailey added that Claimant's autoimmune hepatitis and immunosuppressant medications kept Claimant from having a social life, noting that Claimant was susceptible to contagious diseases. (Tr. at 348). Mr. Bailey stated that he was "basically [a] 100% caregiver" in terms of grocery shopping, house cleaning, preparing meals, helping Claimant in and out of bed, and helping to bathe her. (*Id.*).

### C. Claimant's Statements

On July 10, 2013, Claimant completed an Adult Function Report. Claimant stated that it took her about an hour to get moving in the morning, but she then "stayed busy all day." (Tr. at 288). She cared for her husband, doing "the usual" household chores such as laundry and making simple meals daily. (Tr. at 288-89). She also walked her dog twice a day. (Tr. at 288). She took care of "all housecleaning, laundry, some repairs, mowing the grass [weekly], and taking care of [her] flowers outdoors." (Tr. at 289). Her husband "sometimes" helped her carry up laundry from the basement and put it away or helped her with household repairs. (*Id.*). Claimant shopped for groceries and household necessities weekly. (*Id.*). Her hobbies included reading, gardening, and redesigning the interior of her home. (Tr. at 291).

On January 14, 2014, Claimant completed another Adult Function Report. At that time, she reported that her daily activities still included walking her dog, but her husband would do it if her feet hurt too much. (Tr. at 331). She still prepared simple meals daily, but her husband usually prepared dinner. (Tr. at 332). She still did laundry and vacuumed, but stated that she became fatigued more easily and chores took her longer to accomplish. (*Id.*). She needed help carrying the laundry and the vacuum to the second floor. (*Id.*). Claimant shopped for groceries twice a month, usually for no longer than 30 minutes at a time because she could not "stand that long." (Tr. at 333). Claimant also shopped online and handled the household finances. (*Id.*). She reported no social activities and stated that she did not go anywhere on a regular basis except for the grocery store. (Tr. at 334). However, she would speak with and "Facetime" her three children who lived out of state. (Tr. at 335).

At the time of the administrative hearing on February 16, 2016, Claimant testified that she was 5 feet 7 and one-half inches tall and weighed 270 pounds. (Tr. at 61). Claimant lived with her husband and drove once or twice a week to the grocery store. (Tr. at 62-63). Between 2010 and 2013, Claimant worked as a landscaper, sometimes for 40 hours per week, but earned only around $650 per month. (Tr. at 71). She described it as "heavy work," such as carrying bags of mulch, bushes, and containers. (Tr. at 72). At the time of the hearing, Claimant stated that she continued to do landscaping for an attorney in town, but was much slower. (Tr. at 73). When asked what prevented her from working, Claimant mentioned issues with her feet, autoimmune hepatitis, inability to focus, and "bad" knees. (Tr. at 73-74). She stated that she had undergone four foot surgeries, and none of them helped her. (Tr. at 73, 84). She also reported depression. (Tr. at 75, 77, 85). Claimant described having pain after sitting for 20 minutes. She could stand for 15

minutes and walk for 100 yards before having problems. (Tr. at 78). She testified that she could lift a gallon of milk, but not a case of soda. (Tr. at 78-79). She stated that she had reduced hand strength due to arthritis. (Tr. at 79). Claimant had no trouble reaching in any direction and could stoop and bend, but could not crouch or kneel. (Tr. at 79). She had a "little bit" of an issue with her memory, occasionally had problems making decisions; and had trouble maintaining concentration, but she had no problems understanding information or instructions. (Tr. at 80). Claimant had difficulty sleeping and only slept from approximately 4:00 a.m. to 8:00 a.m., which she thought was due to hip pain. The lack of rest affected her ability to focus during the day. (Tr. at 83-84). In a typical day, Claimant would "try to run the sweeper upstairs on the second floor" and taught herself how to start making jewelry and wind catchers. (Tr. at 81). Once a week, Claimant went downstairs to do the laundry and her husband carried it up for her. (*Id.*). She could mow the lawn, stopping if she needed to, and she also paid the bills online. (*Id.*). She tried to do as much at home as she could, like changing the bed with her husband's help, stating that he had to help with "pretty much everything" she did. (*Id.*). She did not go to church, visit people, or eat out. (Tr. at 81-82).

Following the ALJ's decision, Claimant submitted a letter dated October 18, 2014, which was incorporated into the record by the Appeals Council. (Tr. at 349-57). In this letter, Claimant stated that during the relevant time frame, she could not perform chores in her home, such as running the vacuum or going to the basement, because she was immobile from four surgeries one after another for four years and then diagnosed with hepatitis. (Tr. at 349). Claimant stated that she could not "do much of anything" and the "only thing" that she could do was sit at the computer for 20 minutes and pay the bills each month, although that was difficult at times. (*Id.*). She also stated that her social

functioning was drastically changed since her alleged onset and she did not go anywhere but the doctor's office in contrast to when she used to socialize with friends with her husband. (*Id.*). Claimant also stated that she spent less than 15 minutes per week making jewelry and wind catchers; she stated that she needed something to do in addition to lying in bed and reading. (Tr. at 350). Claimant also explained that she challenged the ALJ's factual findings, analysis, and conclusions stated in the decision. (Tr. at 352-57).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. __Discussion__

### A. Opinion Evidence

In her first challenge to the Commissioner's decision, Claimant argues that the ALJ erred in placing great weight on the opinions of the non-examining state agency physicians and no weight on the opinions of her treating physicians, Drs. Simpson and Snyder, or the consultative examiner, Dr. Young.[1] (ECF No. 11 at 13-16). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well

---

[1] Although Claimant states that this challenge concerns the ALJ's failure to develop the medical evidence, her discussion focuses entirely on the ALJ's treatment of the medical opinions. Claimant does not point to any gaps in the record or evidence which should have been further developed by the ALJ. Indeed, the medical evidence in this matter is thorough and extensive. Therefore, the undersigned construes this challenge as a criticism of the weight and analysis of the opinion evidence.

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[2] and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[3] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays,* 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the

Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, state agency physicians reviewed Claimant's records and submitted RFC opinions in October 2013 and April 2014 that Claimant was capable of performing light level work with occasional postural activities and no exposure to extreme cold, vibration, or hazards. (Tr. at 128-29, 142-45). Claimant's primary care physician, Dr. Snyder, submitted a RFC opinion in September 2015, approximately one year after Claimant's date last insured, stating that Claimant was capable of much less than a limited range of light work; specifically, Dr. Snyder opined that Claimant could only lift and carry up to ten pounds regularly; stand for one hour and sit for two to three hours due to osteoarthritis; lie down for two hours per day due to joint pain; walk for 100 to 200 yards without stopping; never pull, push, or lift; and had difficulty bending, squatting, and kneeling. (Tr. at 1045-47). Dr. Snyder stated that, in his opinion, Claimant could not work due to her knee impairment. (Tr. at 1048).

The following day, Claimant's previous primary care physician, Dr. Simpson, completed a RFC form. Dr. Simpson stated that Claimant could not stand for six to eight hours, but did not know if she could sit for that amount of time. (Tr. at 1052). He estimated that Claimant could walk 100 feet without stopping and stated that she had difficulty bending, squatting, kneeling, and turning part of her body. (Tr. at 1054). Dr. Simpson likewise believed that Claimant could not work, stating that she could only stand for a short period of time, noting that her legs were swollen and stiff, and she had autoimmune disease. (Tr. at 1055).

Shortly thereafter, in November 2015, Claimant underwent an independent medical examination at the request of Dr. Simpson and her attorney in connection with her claim for social security benefits. (Tr. at 1038). The examiner, Dr. Young, noted that Claimant had  mild edema and a mildly antalgic limp. (Tr. at 1040). He further noted some limited range of motion in her toes and pain and tenderness in her plantar fascia with passive dorsiflexion. (Tr. at 1040-41). Dr. Young also noted mildly reduced grip strength and indications of carpal tunnel syndrome, pain and crepitus in her knees with flexion limited to 100 degrees on the right and 110 degrees on the left (normal was 120 to 130 degrees). (Tr. at 1041). Dr. Young opined that Claimant's pain in her feet, knees, and lower back; carpal tunnel symptoms; hypothyroidism; autoimmune hepatitis; and the burden of treatment for such issues produced the "perfect storm of medical conditions" that progressively limited her ability to function; he did not see any real possibility that she could maintain employment and did not believe her condition would improve. (*Id.*).

In reviewing and weighing these opinions, the ALJ gave the state agency opinions great weight, but gave no weight to Dr. Young's opinion that Claimant could not work, noting that the opinion as to whether Claimant could work was an issue reserved to the Commissioner. Further, the ALJ noted that Dr. Young's examination occurred more than a year after Claimant's date last insured, and Dr. Young did not indicate that she suffered from the same severity of symptoms during the relevant period. (Tr. at 50). Moreover, the ALJ noted that the severity of restrictions found by Dr. Young in November 2015 were not reflected in the examination only two months earlier by Claimant's treating physician, Dr. Snyder. (*Id.*). For similar reasons, the ALJ gave little weight to the opinions of Drs. Snyder and Simpson that Claimant suffered from disabling limitations, finding that they were inconsistent with records from the relevant time frame, as well as the later records, which

indicated that Claimant had good exercise habits and normal activities of daily living, with normal balance, gait, and stance. (*Id.*).

As the ALJ indicated, during the relevant period, Claimant was able to handle her personal care needs without significant limitation, run the sweeper upstairs, do the laundry in the basement, make beds, mow the lawn, and prepare simple meals. (Tr. at 47-48). Further, the ALJ cited that despite her failed injection therapy and foot surgeries, Claimant exhibited a normal gait with no obvious instability, full range of motion, normal muscle strength, and normal neurological findings. (Tr. at 48). Her podiatrist, Dr. Brown, stated that Claimant was doing well following surgery. (*Id.*). Moreover, the ALJ explained that, contrary to the complaints of severe pain Claimant made to Dr. Simpson, she walked with only mild difficulty at her visits with him. On examination, she had no clubbing, cyanosis, joint deformities, or edema; normal reflexes, pulses, muscle tone; and was neurologically intact with no deficits noted. (*Id.*). Regarding Claimant's osteoarthritis in her knees, the ALJ noted Claimant's x-ray results, pain medication, and injections; however, the ALJ remarked that in November 2013, despite a limping gait on her right side on which she recently had foot surgery, Claimant had no obvious instability, full range of motion, no obvious deformities, minimal swelling, uneventful healing, and no neurological deficits. (Tr. at 49) Also, approximately one year later, in November 2014, Claimant reported that her pain was slightly improved; she had normal activities of daily living and was in no acute distress; and she had full range of motion and normal gait. (*Id.*). As to Claimant's diagnosis of autoimmune hepatitis in March 2014, the ALJ observed that Claimant began taking medication and, by August 2014, reported that she felt better, had more energy, and was able to work. In October 2014, her medication was considered to be working well for her. (*Id.*). Finally, the ALJ assessed Claimant's obesity,

remarking on Claimant's unwillingness to adopt better diet habits. (*Id.*). The ALJ noted that even more recent records in July and September 2015 showed that Claimant was doing well on her medication regimen, said she felt better, her activity level was back to normal, her blood work was normal, and she reported good exercise habits and normal activities of daily living. (Tr. at 50-51).

The Court's role in reviewing the weight that an ALJ assigned to medical opinions is limited to determining whether the ALJ's decision is supported by substantial evidence and based upon a correct application of the law. As noted, the Court's role is not to substitute its analysis for that of the ALJ, nor is it to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456. In this case, the ALJ complied with the law in reviewing and considering the opinions offered by Drs. Young, Simpson, and Snyder. The ALJ determined that their opinions that Claimant suffered from disabling conditions and restrictions were not well-supported by medical findings and were, in fact, inconsistent with treatment records from the relevant period, as well as the period after Claimant's date last insured. The ALJ pointed out that Claimant's treatment records in 2015, from the same time period that Drs. Young, Snyder, and Simpson's opinions were rendered, reflected that Claimant was in much better shape than described in their opinions. This analysis is supported by substantial evidence, as discussed in further detail below.

Despite her allegations of disabling impairments since January 2009, Claimant admittedly worked as a self-employed landscaper between 2010 and 2013; while her earnings did not rise to the level of substantial gainful activity, she described it as "heavy work," such as carrying bags of mulch, bushes, and containers. (Tr. at 71-72). Even at the time of the administrative hearing in February 2016, well after the date last insured,

Claimant continued to do landscaping work, albeit somewhat "slower" than before. (Tr. at 73). Also at the administrative hearing, as the ALJ referenced, while Claimant stated that she needed her husband's help with pretty much everything, her typical activities included vacuuming upstairs, making women's jewelry and wind catchers, doing laundry downstairs every week, mowing the lawn, and paying bills online. (Tr. at 81).

Furthermore, despite Claimant's complaints that she was "spent" and felt like she was "falling apart" due to her chronic medical conditions, even Claimant's records at the end of the relevant period show that Claimant was self-reliant in her daily activities. She could not fully manage the household on her own, but she had a normal gait, full range of motion, no focal deficits, and her hepatitis was under control. (Tr. at 957, 958, 965, 967, 976-77, 988, 1060, 1065). As noted by the ALJ, Claimant stated in August 2014, that she was feeling much better, had more energy, and could work. (Tr. at 967). Just after her date last insured, Claimant reported that she was "close to being okay" and her illnesses appeared to be controlled with medications. (Tr. at 1058). She was doing "strenuous" landscaping jobs and her autoimmune hepatitis was under "excellent control." (Tr. at 898, 918, 941, 1058). In fact, even as late as June 2016, years after Claimant's date last insured, Claimant's podiatrist, Dr. Brown, noted that she had a normal gait, full range of motion and muscle strength, with normal sensation, and no evidence of swelling, redness, obvious instability, or deformities. (Tr. at 107). At an examination with her orthopedist, Dr. Tao, the following month, Claimant had a trace limp, but normal coordination and sensation, no loss of motion or strength, and her physical examination was unremarkable other than slight tenderness to palpation in her left knee, but both knees were essentially painless. Claimant reported that her right knee pain averaged only a "2" out of "10." (Tr. at 105-06).

Critically, as stated by the ALJ, Drs. Snyder, Simpson, and Young's opinions were rendered on September 24, September 25, and November 21, 2015, respectively. Dr. Snyder's notes on the precise date of his RFC opinion, September 24, 2015, do not appear to support his conclusions that Claimant could only stand for an hour, sit for two to three hours, walk for 100 to 200 yards without stopping, carry five to ten pounds or that she had severe postural limitations and had to lie down for hours during the day. At Claimant's examination on that date, Claimant had lost two pounds, was walking for exercise, and had done yard work recently. (Tr. at 871). She was continued on Celebrex for osteoarthritis and also received steroid injections in her knees at her request. (Tr. at 872, 874). Claimant's physical examination with Ms. Conaway shortly thereafter, on October 7, 2015, was unremarkable. (Tr. at 865-66). Therefore, there is substantial support for the ALJ's determination that the opinions rendered by Drs. Snyder, Simpson, and Young were inconsistent with the medical evidence.

For all of the above reasons, the undersigned **FINDS** that the ALJ properly considered and weighed the medical opinions in this matter.

### B. Combination of Impairments

In her second challenge to the Commissioner's decision, Claimant argues that the ALJ failed to consider the combined effect of her "perfect storm" of impairments. (ECF No. 11 at 16-17). An ALJ must consider the combined, synergistic effect of all of a claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulation provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider

the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

In this case, the ALJ fulfilled the obligation to evaluate Claimant's impairments, separately and in combination. The ALJ thoroughly considered Claimant's mental impairments of anxiety and depression. (Tr. at 45). The ALJ analyzed the broad functional areas known as "paragraph B" criteria and determined that Claimant had no more than mild impairments in activities of daily living, social functioning, and concentration, persistence, or pace. (*Id.*). Further, the ALJ noted that Claimant had no episodes of decompensation of extended duration. (Tr. at 45-46). In crafting Claimant's RFC, the ALJ considered all her impairments, including her depression, anxiety, foot and knee impairments, fibromyalgia, autoimmune hepatitis, obesity, and all of her alleged symptoms. (Tr. at 48-49). The ALJ specifically considered the extent to which Claimant's

45

impairments impacted each other and contributed to her overall ability to function. (*Id.*). The decision clearly articulates the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude her from engaging in substantial gainful activity. To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration to be unnecessary. At worst, the lack of further elaboration was harmless error,[4] because the required analysis clearly took place. Therefore, the undersigned **FINDS** that the ALJ complied with his duty under the applicable law to consider Claimant's impairments in combination.

### C. Daily Activities and Social Functioning

In her third challenge to the Commissioner's decision, Claimant argues that the ALJ "reached a number of conclusions about the Claimant's functioning that are not supported by the record." (ECF No. 11 at 17). Claimant contends that the ALJ overstated her daily activities and social functioning and failed to fully consider Claimant's own statements regarding her limitations in such areas. (*Id.*).

At step two of the sequential evaluation, and throughout the remainder of the

---

[4] Courts have applied a harmless error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

decision, the ALJ considered Claimant's activities of daily living and social functioning. The ALJ noted that Claimant had mild limitations in both areas, citing that Claimant could handle her personal care and perform household chores without significant limitation; such as, running the sweeper upstairs, doing laundry in the basement, making beds, mowing the lawn, paying bills online, and preparing small, simple meals. (Tr. at 45). Further, the ALJ remarked that Claimant's grooming, hygiene, and social functioning were normal during her consultative examination in March 2014. Although she did not attend church, eat out, or visit people, she cared for her dog, drove, attended doctor's appointments, and went shopping. (*Id.*). Further, the ALJ noted that Claimant reported in August 2014 that she felt better, had some more energy, and was able to work. She reported normal activities of daily living in November 2014, just after her date last insured. (Tr. at 49). Claimant also said that her activity level was normal in July 2015, almost a year after her date last insured. (Tr. at 50).

As previously noted, it is the ALJ's obligation, not that of the Court, to make factual findings, weigh evidence, and assess the credibility of a Claimant's statements. Moreover, an ALJ is not required to comment on every piece of evidence in the record. *Cook v. Colvin*, No. 2:13-CV-30155, 2015 WL 430880, at *16 (S.D.W. Va. Jan. 30, 2015) (citations omitted). In this case, the ALJ's assessment of Claimant's daily activities and social functioning is supported by the record. Claimant indeed testified that she could perform the activities such as vacuuming, laundry, cooking simple meals, and making jewelry and wind catchers, as noted by the ALJ. (Tr. at 81, 288-91, 331-34). Likewise, as to Claimant's social functioning, Claimant stated that she regularly went to the grocery store, cared for her dog, attended medical appointments, spoke with and "Facetimed" her three children who lived out of state, drove, and did landscaping jobs. (Tr. at 62-63, 71-73, 289, 333-35).

47

Claimant qualified some of her statements; such as, stating that she would "try to run the sweeper upstairs on the second floor;" did laundry in the basement, but her husband had to carry it up for her; changed the bed with her husband's help; and mowed the lawn because she could stop, if needed. (*Id.*). Nonetheless, Claimant conceded that she was capable of such activities. The ALJ clearly acknowledged all of Claimant's statements, including her alleged limitations and symptoms. (Tr. at 45, 47). The ALJ's analysis is not misrepresentative of Claimant's statements; to the contrary, the written decision substantiates that the ALJ conducted a careful analysis after weighing Claimant's various statements regarding her functional abilities, the objective evidence, and the other evidence in the record. Therefore, the undersigned **FINDS** that the ALJ properly considered Claimant's activities of daily living and social functioning in the decision.

### D. Vocational Expert Testimony

In her fourth challenge to the ALJ's decision, Claimant argues that the ALJ failed to supply the vocational expert with a hypothetical question that was consistent with Claimant's limitations. (ECF No. 11 at 18). Specifically, Claimant contends that the ALJ should have concluded that Claimant was disabled given the volume of medical appointments that Claimant had in 2013 and 2014. The ALJ should have acknowledged the vocational expert's testimony that a person with Claimant's limitations, who would miss two days or more a month for doctor's visits, could not maintain full time employment. (*Id.*).

In this case, as noted above, the ALJ questioned the vocational expert whether a hypothetical individual with Claimant's characteristics and RFC could perform any of Claimant's past relevant work, and the vocational expert provided an affirmative response. (Tr. at 87-88). Claimant's attorney then questioned the expert if the

hypothetical individual could maintain employment if the person was required "to miss work several times a month related to medical appointments." (Tr. at 89). The expert responded that a person who missed two or more days of work per month could not maintain full time employment. (*Id.*).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

Here, Claimant offers no evidence that she would have missed work two or more days per month during the relevant period. Therefore, there was no reason for the ALJ to

incorporate such a limitation into the hypothetical questions posed to the vocational expert, or rely on the vocational expert's response to such a hypothetical question. With the exception of May 2014, when Claimant was admitted to the hospital with jaundice, Claimant's records document routine scheduled appointments with her primary care provider and specialists and some pre-scheduled surgeries. For example, Claimant would often see her primary care physician, Dr. Simpson, as well as her podiatrist, Dr. Brown, in the same month. There does not appear any support for Claimant's assertion that she would miss two or more days of work per month for medical appointments, or that her medical appointments could not be planned to accommodate her work schedule. This is not a case in which Claimant suffered unforeseen medical emergencies or complications. Rather, Claimant had regularly scheduled appointments for maintenance of her chronic conditions. Thus, there is no indication that such appointments would require her to miss a full day of work, much less multiple full days of work per month. *See, e.g., Hickey v. Berryhill*, No. CV ADC-16-3524, 2017 WL 4023095, at *4 (D. Md. Sept. 12, 2017) ("Here, in contrast, Plaintiff's absenteeism would arise from scheduled appointments, not 'quite frequent' emergencies, which could hopefully be arranged to accommodate Plaintiff's work schedule.") (citations omitted); *Peters v. Astrue*, No. CIV.A. 1:08-CV-203, 2009 WL 6326804, at *11 (N.D.W. Va. Sept. 29, 2009), *report and recommendation adopted sub nom. Peters v. Comm'r of Soc. Sec. Admin.*, 2010 WL 1369245 (N.D.W. Va. Mar. 31, 2010) ("However, no doctor opined that Plaintiff is unable to work because of numerous doctor appointments. Plaintiff does not rely on a medical opinion that she is unable to work due to frequent absenteeism, but instead she presents her history of appointments in support of her argument ... In addition, the majority of Plaintiff's appointments would not require her to miss a full day of work."). Therefore, the undersigned **FINDS** that the ALJ posed

a proper hypothetical to the vocational expert and properly relied on the expert's testimony at steps four and five of the sequential evaluation.

### E. Appeals Council Evidence

In her fifth and final challenge to the Commissioner's decision, Claimant argues that the Appeals Council failed to consider or give any weight to the new evidence submitted by Claimant, including signed statements from Claimant and her husband and letters from Drs. Young and Brown. (ECF No. 11 at 19-20).

When new and material evidence is submitted to the Appeals Council after the ALJ's decision, the Appeals Council:

> Shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R § 416.1470(b).[5] Evidence is new when it is not "duplicative or cumulative," and is material "if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dep't of Health and Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991). When the Appeals Council incorporates new and material evidence into the administrative record, but denies review of the ALJ's findings and conclusions, the inquiry before the reviewing court is whether the Commissioner's decision is supported by substantial evidence in light of "'the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated ... into the administrative record.'" *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (quoting *Wilkins v. Sec'y, Dep't of Health and*

---

[5] The regulation was amended effective January 17, 2017 to add provisions that post-date the Appeals Council's consideration of Claimant's request for review and are not relevant to the issues in dispute.

*Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)); *see also Snider,* 2013 WL 4880158, at *5 ("[W]here a claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence and made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings.").

New and material evidence does not automatically require remand, and certainly not simply because the ALJ never reviewed the evidence. Instead, the question is whether the lack of additional fact-finding pertinent to the new evidence "render[s] judicial review 'impossible'" because the record no longer provides "an adequate explanation of [the Commissioner's] decision." *Meyer,* 662 F.3d at 707. In *Meyer,* the United States Court of Appeals for the Fourth Circuit provided examples of when new and material evidence would or would not require remand. *Id.* For example, when the new evidence was generated by a treating physician, provided additional opinions not controverted by other evidence in the record, and constituted the only opinions of the treating physician, remand was generally required. *Id.* On the other hand, if substantial evidence supported the ALJ's decision, even when factoring in the new evidence, remand was unnecessary. *Id.*

Given the scope of judicial review in social security disability cases, "District Courts have limited the applicability of *Meyer* to those cases where an evidentiary gap exists in the medical record," which is filled by the new and material evidence. *Meadows v. Berryhill*, No. 516CV00068 RJC-DSC, 2017 WL 4534771, at *4 (W.D.N.C. Oct. 11, 2017). Consequently, the reviewing court must "focus on determining whether [the] new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.' Where no such conflict is present, the

case can be decided on the existing record without remand." *Flesher v. Colvin,* No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) *(*quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013)); *see, also, Yost v. Astrue*, No. CIV. A. TMD-08-2942, 2010 WL 311432, at *3 (D. Md. Jan. 19, 2010) ("[W]hile evidence considered by the Appeals Council must have been found to be "material", *i.e.* a reasonable possibility that it would have changed the outcome, that alone clearly does not necessitate a finding at the district court level that the case be remanded. Rather, at this juncture, the Court's role is to determine whether the record, as whole (including that evidence considered by the Appeals Council), supports the Commissioner's findings.") *and Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015) (holding that the "touchstone of the ... analysis [is] whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'"). Put simply, if the new evidence "is not in blatant contradiction with and does not cast serious doubt upon the original evidence reviewed by the ALJ, then remand is unnecessary if the ALJ's decision is supported by substantial evidence." *Shuman v. Berryhill*, No. 3:16-CV-62, 2017 WL 3476972, at *5 (N.D.W. Va. Aug. 14, 2017) (citing *Flesher*, 2016 WL 1271511, at *9–10).

First, considering the letters provided by Claimant and her husband that the Appeals Council incorporated into the record, the undersigned finds that substantial evidence supports the ALJ's decision even when factoring in the additional evidence. (Tr. at 347-357). Both letters indicate that Claimant was mostly immobile during the relevant period due to surgeries and hepatitis, could not do "much of anything" for herself, and had no social interaction. (*Id.*). However, as discussed with respect to Claimant's prior challenge, the record is replete with evidence to support the ALJ's findings that Claimant

had only mild functional limitations, including Claimant's own statements in an Adult Function Report, at the administrative hearing, and during treatment. While these new letters submitted by Claimant and her husband conflict in several respects with many of Claimant's prior statements and the ALJ's findings, they do not fill any evidentiary gap or render judicial review impossible.

As to Dr. Brown's additional records and medical opinion, the undersigned likewise finds that such evidence does not cast serious doubt on the original evidence reviewed by the ALJ. (Tr. at 1065-85). Claimant saw Dr. Brown in February 2014 for a steroid injection and in June 2014, Dr. Brown noted that Claimant's feet were doing well and there were no concerns at that time. (Tr. at 1065). Claimant was fully oriented; with a normal gait, muscle strength, tone, and reflexes; no obvious instability, deformities, swelling, or redness; full range of motion; asymptomatic flexor and extensor tendons that were within normal limits; and normal peripheral pulses, sensation, and neurological findings. (*Id.*). Her x-rays showed no acute process. (*Id.*). Therefore, it is unclear what evidentiary gaps such evidence fills or how it renders the ALJ's analysis of Claimant's foot impairments, combinations of impairments, or ultimate decision unsupported by substantial evidence. Further, Dr. Brown's medical source statement dated October 3, 2016 does not provide any medical information that was not already in the file and appears to discuss her "current condition" years after her date last insured. (Tr. at 1085).

Finally, the undersigned considers Dr. Young's letter dated **September 26, 2016**. (Tr. at 1086-87). In the supplemental letter submitted to the Appeals Council, **Dr. Young stated that he believed Claimant's conditions were affecting her in the same way even two years prior to his evaluation and his opinion would likely have been the same had he seen her in 2013 or 2014. (Tr. at 1087). Dr. Young noted that Claimant's bilateral foot pain**

54

dated as far back as 2008 and she had years of bilateral knee pain. (Tr. at 1086). He further stated that what "put her over the edge functionally" was her autoimmune hepatitis and hypothyroidism that were diagnosed in February 2014, but caused issues for months before the diagnoses. (*Id.*).

This letter does not undermine the substantial evidence supporting the ALJ's decision. While *one* of the reasons that the ALJ did not give great weight to Dr. Young's conclusions was the ALJ's finding that Dr. Young did not relate the severity of Claimant's impairments to the relevant period, a fact which could be resolved by Dr. Young's supplemental letter, the ALJ was clear that the primary basis for not adopting the opinions of Drs. Young, Snyder, and Simpson was that the physical examinations, the objective evidence, and even Claimant's own statements in the treatment records during the relevant period did not support the severity of restrictions assessed. (Tr. at 48-51). Moreover, Dr. Young's speculation, as a one-time consulting examiner, that his opinion would likely have been the same had he examined Claimant during the relevant period does not call into question the plethora of medical evidence during the relevant period that supports the ALJ's decision. Without fully restating the discussion that was provided with respect to Claimant's prior challenges, the ALJ noted that Claimant was doing landscaping jobs; "close to being okay" in October 2014; doing well on her medications, feeling better, and back to normal activity level in July 2015; and she had normal physical findings, balance, gait, and stance in October 2015. (Tr. at 50).

Therefore, for the reasons stated above, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence, including evidence submitted to the Appeals Council and incorporated into the record; thus, the additional evidence does not provide a basis for remand.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 10, 2018

Cheryl A. Eifert
United States Magistrate Judge